IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 8:25-mj-02215-GLS |
| | * | |
| ROBERT MATTHEW SHINES, | * | |
| | * | |
| Defendant | * | |
| | * | |

*******

## GOVERNMENT'S MOTION FOR DEFENDANT'S PRETRIAL DETENTION

Pursuant to Title 18, United States Code, Section 3145(a), the United States of America hereby asks the United States District Court to review and revoke the decision of the United States Magistrate Judge on October 20, 2025, to release the Defendant **ROBERT MATTHEW SHINES** on conditions.

The Defendant is charged under the Espionage Act of 1917 with a serious national security charge, conspiring to gather and deliver defense information to the government of the People's Republic of China ("PRC") in violation of 18 U.S.C. § 794(c).[1] As evidenced by the Defendant's own statements, many of which are outlined in the detailed Complaint, the Defendant willfully plotted with agents of the PRC to obtain classified and highly sensitive information relating to topics including missile systems, the defenses of the United States and its allies, U.S. military

---

[1] The Government is entitled to seek detention pursuant to 18 U.S.C. § 3142(f)(1)(B) because the charge carries a possible penalty of a life sentence. The Government estimates the base offense level to be 37 pursuant to U.S.S.G. § 2M3.1(b), which would result in an advisory guidelines range of 210 to 262 months' incarceration, assuming that he falls within Criminal History Category I. Assuming the defendant qualifies for a zero-point offender reduction under U.S.S.G. § 4C1.1, the offense level would be reduced downward by 2 levels, resulting in an advisory guidelines range of 168-210 months In the event the defendant agreed to plead guilty and accept responsibility under U.S.S.G. § 3E1.1, the advisory guidelines range would be reduced by an additional 3 levels, resulting in an advisory guidelines range of 121-151 months.

chain-of-command systems, and the U.S. military's involvement in a simulated attack, for passage to the PRC. Specifically, the Defendant's messages show him strategizing with his handlers about the best ways to persuade U.S. government employees and contractors to provide classified information, including by interspersing or "shuffling" requests for unclassified information with requests for classified information.

In exchange for his efforts, the Defendant received at least $78,000 from his handlers, including through covert courier payments conducted at suburban parks, demonstrating the substantial value of the services he provided to the PRC. Indeed, the business the Defendant started appears to have had the primary purpose of funneling information to agents of the PRC in exchange for money.

Importantly, this is consistent with how the Defendant described himself to a co-conspirator in an encrypted text message on December 6, 2024:

> I misjudged [Individual #1]. He's a soldier who believes in something bigger than himself. That's why his country trusted him with a security clearance in the first place. He's very similar to you, your colleagues, and your clients. And that's why <u>your country trusts all of you with your various security responsibilities. Not like me, some piece of s\*\*\* mercenary businessman who only believes in money</u>. And that's why I'd never be able to get a security clearance myself and work for the government.

(emphasis added). With this message, the Defendant confirmed: (a) his understanding that his handlers served in trusted national security roles for a foreign government, and (b) his willingness to give them sensitive information in exchange for money.

This and other messages cited in the Complaint show that the Defendant has been cashing in on sensitive information from current and former U.S. government personnel since at least 2021, and the evidence shows that he continued to try to do so until this month. As recently as October 10, 2025, the Defendant contacted a former U.S. Government intelligence analyst, identified in the

2

Complaint as Individual #2, *see* ¶¶ 29-32, and said he had "even more projects coming in now due to increasing geopolitical uncertainty."[2]

The Defendant's own statements reflect not just the strength of the evidence and his intent; they also demonstrate his active efforts to evade detection and accountability, including by taking steps to conceal his conduct from U.S. law enforcement. Accordingly, this is not a Defendant who is likely to abide by rules of pretrial release in the long term. Although there have been no identified violations of his conditions of supervision since his arrest, the Defendant is likely to be the most compliant in these earliest days after his arrest, particularly while this motion is pending.

As set forth below, based on the nature and seriousness of the charge and the history and characteristics of the Defendant, the Defendant poses a danger to the community, and there is no combination of conditions that will reasonably assure the safety of the community as well as assure his appearance. Thus, the Defendant should be held pending trial in this matter.

## I.      LEGAL STANDARD.

The factors a court must consider in determining whether a defendant poses a danger to the community include:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves . . . a controlled substance [or] firearm;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person . . . ; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g). In this case, an examination of the § 3142 factors demonstrates that the Defendant should be detained pending trial.

---

[2] FBI agents in Kansas City interviewed Individual #2 during the execution of a search and seizure warrant. The subject spoke to agents after a voluntary waiver of his rights pursuant to *Miranda* and had counsel present during the portions of the interview referenced herein.

## II. THE DEFENDANT SHOULD BE DETAINED

### A. The Nature and Circumstances of the Offense

The nature and circumstances of the offense here support detention. This case involves a U.S. citizen spying for the Chinese government in exchange for money. Violations of 18 U.S.C. § 794 are infrequently prosecuted but exceptionally serious. This is demonstrated by the fact that a conviction under § 794 is punishable by a term of imprisonment of up to life in prison, and in some circumstances, by death. In this case, the estimated advisory guidelines range before any credit for acceptance of responsibility provides for a sentence of 168-210 months. The severity of the potential penalties reflects the profound harm that violations of this statute can cause to national security and foreign relations. Indeed, by definition, a violation of § 794 involves the "intent or reason to believe" that the transmission of the information at issue will cause "injury of the United States" or "advantage [to] a foreign nation." 18 U.S.C. § 794(a).

While the Defendant did not have a security clearance himself, he identified and recruited U.S. Government personnel, including U.S. security clearance-holders, in an effort to elicit sensitive national security information from them. In spy parlance, the Defendant was a "cut out" used by the PRC intelligence services to target U.S. clearance holders. The Government does not know with certainty at this point the full scope of who those potentially compromised U.S. clearance holders are, what sensitive information the Defendant obtained from them, and what information the Defendant passed on to agents of the PRC. Accordingly, the Government does not know with certainty what information the Defendant has in his head that could cause further harm to the U.S. Government or benefit the PRC Government. The investigation is ongoing. However, the Government *does* know that the Defendant actively sought to obtain classified and other sensitive information, which he referred to as "C info," from current and former U.S.

4

Government officials, and that the information he provided was valuable to the PRC Government, as demonstrated by the fact that PRC agents paid him more than $40,000 for some of the information he provided and reimbursed him another $38,000 to recruit workers. The Government also knows that the Defendant affirmatively sent a document ("Document 1") to an agent of the PRC via encrypted means; that the Defense Intelligence Agency ("DIA") reviewed a document with the same name that recovered from Individual #2's devices and determined it contained information classified at the SECRET level; and that Individual #2 admitted to copying information from a classified U.S. government system by hand, incorporating it into a report, and sending that report onward to the Defendant.

Part of the reason why the Government has an incomplete understanding of the Defendant's criminal activities is that some of his meetings with his handlers took place in the PRC. In addition to communicating via reports and electronic messages, the Defendant also traveled to the PRC on multiple occasions to meet with his handlers in person. Between 2017 and the present, the Defendant traveled to the PRC seven times, even including an extended gap during the Covid pandemic. The Government has limited insight into what took place during the Defendant's meetings in the PRC, but the fact that he met them there on multiple occasions over a period of years shows the depth of their relationship, demonstrates that the information he provided was valuable to the PRC, and suggests that any information contained in his mind likely still of value to the PRC or any other interested buyer. This poses a significant danger to the community and provides a reason for the PRC to assist with efforts by the Defendant to flee the United States. *See United States v. Madrigal*, No. 3:22-CR-00019, 2023 WL 2823504, at *11 (W.D. Va. Apr. 7, 2023). Given the nature and length of the relationship, representatives of the PRC may be motivated to help someone in the Defendant's position because the PRC does not want the

Defendant to tell the U.S. Government or others about sensitive tradecraft including, *inter alia*: the identities of recruited individuals, co-conspirators, and couriers; methods of recruitment, communications, and payments; and the specific categories of information agents of the PRC were interested in.

In addition to traveling to the PRC for in-person meetings, the Defendant obscured his activities by engaging in espionage tradecraft and other evasive conduct to conceal his relationships and the nature of the information he provided. This included using encrypted messages, engaging in covert courier payments, structuring payments in quantities of less than $10,000 to avoid U.S. Government currency reporting requirements, and avoiding or limiting deposits in U.S. financial institutions to evade detection. For example, on October 9, 2024, a co-conspirator asked the Defendant, "when you get back to US from HK, how much cash can you take, not arouse unnecessary suspicion." The Defendant replied, "$9,000," which is just under the $10,000 reporting threshold for a financial institution's requirement to file a Currency Transaction Report. The Defendant essentially acknowledged this to FBI agents. When he was asked if he was worried about coming through Customs with a bunch of cash, the Defendant admitted that he received payments of "not more than $10,000, something like that." Similarly, on April 17, 2025, the same co-conspirator asked the Defendant, "how much money can you take back after our meeting in May bro, still 5000?" The Defendant replied, "regarding money, less than $10000. I don't trust U.S. officials." Similarly, in connection with a courier payment, the co-conspirator asked, "is it ok to put it in the bank bro?" The Defendant responded, "[w]hen I say take it to the bank, I mean put it in the safety deposit box myself. I never give it to a worker." The Defendant acknowledged to the FBI that the safety deposit box was his idea because "I was getting a little bit

suspicious and even if…everything was…above board…I was just afraid of the appearance of having too much cash … in anyone bank account."

In addition, in a May 12, 2025, interview with U.S. Customs and Border Protection ("CBP"), the Defendant minimized and concealed his activities from U.S. officials following a trip to Hong Kong. In response to CBP questioning, the Defendant said that he was on vacation and that he had only traveled to Hong Kong on this trip. However, stamps in his passport showed that he had actually visited mainland China for three days, from May 7 through 10. When confronted about his trip to mainland China, he said he was only there for tourism and that he did not meet with anyone on his trip, yet agents have evidence that the Defendant repeatedly communicated with an individual about his travel arrangement to Zhuhai, a city in mainland China, including about his hotel details. In his interview with FBI, the Defendant confirmed that his contacts in China paid for his travel expenses on these trips, including hotels, meals, and airfare.

In short, the Defendant actively sought to develop contacts with people in the U.S. national security community with access to classified information that, if disclosed, could damage the United States and/or benefit the PRC Government; he strategized with his co-conspirators about the best ways to get "C info" from these individuals; he had enough confidence in his the inside information in his possession to market himself to a foreign power based on that information and to accept tens of thousands of dollars in payments for that information; and he maintained a relationship with that foreign power for years. Moreover, representatives of the PRC evidently felt it worthwhile to retain the Defendant's services and pay him a substantial amount of money for that information. Against this backdrop, there is no question that the Defendant has posed, and continues to pose, a danger to national security. Recent events have only increased the Defendant's incentives to harm the United States or aid the PRC Government for his benefit. Currently, the

7

Defendant is facing a substantial prison sentence and has no job aside from the consulting company that he used to carry out the alleged criminal conduct at issue here. His most valuable asset appears to be what he can sell or trade to representatives of the PRC.[3] Under these circumstances, the pretrial conditions of release are simply not sufficient to ensure the safety of the community, or to negate his risk of flight.

There are four particular features of this crime that support the conclusion that the Defendant cannot and will not abide by any pretrial conditions. First, the conduct described in the Complaint shows that the Defendant disdains authority and does not follow rules out of loyalty or principle, or because of the law. If he would violate the espionage laws of the United States, there is no reason to believe he would follow a Court order. Second, his lack of regard for rules demonstrates recklessness that further undermines any confidence that he could abide by conditions. As described in the Complaint, the Defendant specifically expressed concern over being caught like U.S. Senator Robert Menendez and others who were charged with illegally acting as agents of a foreign government within the United States, and about his concerns that "[t]he risk is rising here for me, and this is untenable" in the context of press reports about a secretive Chinese network trying to lure fired federal workers. Nevertheless, he continued to engage with his PRC handlers and individuals he recruited. The fact that the Defendant proceeded with the alleged conduct here demonstrates that he is willing to weigh the risk of getting caught against the perceived benefit. Thus, the evidence suggests that if the Defendant believes he might benefit, he will likely choose not to follow pretrial conditions.

---

[3] The Defendant has approximately $60,000 in his bank account. At present, the Government cannot say that all this money is individuals associated with the PRC, and agents assess that the Defendant received at least a portion of that money through an inheritance.

Third, the scope and duration of the Defendant's conduct is extensive. The Defendant has engaged with agents of the PRC since at least 2021, and as recently as October 10, 2025. He received numerous payments from the PRC, including a $40,000 payment in a Montgomery County public park that he admitted to during his interview with agents. This was no small-time job. He advertised publicly for recruits and contacted between 15 and 20 individuals he believed had or could gain access to information of interest to the PRC. Finally, as described above, the Defendant actively sought to conceal his espionage activity from the government through the use of tradecraft, by withholding information from CBP officials, by structuring payments to evade detection, and by conducting covert courier payments designed to avoid detection by law enforcement.

In sum, the facts of this case demonstrate that the Defendant will act out of self-interest. If he needs to hide information, influence others, or travel to a foreign country to accomplish his goals, he will. Merely surrendering his passport has little practical value in a case like this one, particularly for an individual with no evident ties to Maryland beyond his condominium. He no longer has a business with any meaningful income; he has no local family; and his siblings live in Huntsville, Alabama and Chicago, Illinois. His primary or sole source of money and validation appears to have come from agents of the PRC since at least 2021. He has little incentive to remain in the United States to face the possibility of a substantial sentence.

### B.     Weight of the Evidence

The weight of the evidence here is strong, as acknowledged by Judge Quereshi during the October 20, 2025, detention hearing.[4] The Complaint includes detailed allegations sourced from

---

[4] The Government has obtained a transcript of this hearing and can make it available to the Court upon request.

the Defendant's own e-mails and electronic messages and from his statement to CBP after his May 2025 trip to the PRC.

Developments since the Defendant's arrest have made the case even stronger. As an initial matter, although the Defendant made a number of self-serving and misleading statements to FBI agents after his arrest, many of his admissions corroborate the core allegations in the Complaint. The Defendant admitted that his reference to "c" information in an encrypted messaging exchange with Individual #2 stood for confidential and/or classified information. He also admitted that his interlocutors asked him to provide classified information "again and again and again." And despite knowing that his handlers actively sought classified information, the Defendant admitted he continued to work for them and provide information to them. The Defendant also admitted that he met couriers in Montgomery County parks to receive cash and that he traveled to the PRC and was paid in cash during these trips.

Although the Defendant told investigators that he repeatedly told his interlocutors that he would not pass them classified information and that "I wasn't giving them any kind of classified or sensitive information," this is not supported by the evidence. While Defendant did tell a *new* interlocutor in a September 5, 2025, message that "my firm does not provide any classified info,"[5] this is contradicted by numerous earlier messages that show the Defendant strategizing with an existing co-conspirator about how best to get "C info." In one example, the Defendant "suggest[ed]" to his handlers to "shuffl[e] c projects, in other words, not c, c, c,… non-c, non-c." Complaint, ¶ 28. In another example, the Defendant said "I suggest we *try the other 2 [topics]*

---

[5] Specifically, the defendant told a new contact that "My best client reports have off-the-record info, which my contractors glean from their source using Chatham House rules. However, this may not always be possible because of source comfort level and overall govt confusion re: policy and direction. Also, my firm does not provide any classified information." In response, the new contact stated that "I understand. Our policy consulting primarily provides clients with useful information, which may not be classified…."

10

*later* as they look classified too." Complaint, ¶ 25 (emphasis added). When the Defendant was asked "which topic should we give him first, to let him give us some C info," the Defendant suggested they start with a particular program and if the client had any "follow-up questions" the Defendant could meet with his source in person. *Id*. Contrary to the Defendant's self-serving assertions to investigators, these are not examples of the Defendant saying he would not obtain classified information but rather suggesting that they put off efforts to obtain classified information until a later time when they would be better received.

Accordingly, the Defendant's September 2025 statement to a new interlocutor that he would not provide classified information should be viewed in the context of his candid conversations about how "it is not a good idea to state outright your client's final goal with him, just as they did with me" and the Defendant's recommendation that "[t]he first time will be a trial run that your client can use to judge his suitability for future such projects." *Id*. Against this backdrop, the Defendant's statement that he could obtain "off-the-record info" but not classified information can best be understood as part of a "step by step" process to obtain increasingly sensitive information. *See id*.

Indeed, the Defendant's own communications flatly contradict his assertion to agents that he never provided classified or even sensitive information to his interlocutors. For example, a May 16, 2023, message, the Defendant told one of his PRC handlers that Individual #2 said "I will reach out to a guy I know. He works Cyber Intel and also has a background in HUMINT. Can't guarantee anything though." In a follow-up message, the Defendant wrote to his handler, "[b]ecause of HUMINT, this info may be classified. So please prepare your client," indicating his willingness to provide classified information if and when he received it.

In addition, as noted above, federal agents interviewed Individual #2, who admitted to having access to and copying information from a classified U.S. Government storage system. Specifically, Individual #2 acknowledged that, after transcribing information from that system by hand, Individual #2 transferred it into a report that Individual #2 then sent to the Defendant. This corroborates and expands upon the Complaint's allegation that Individual #2 included verbatim or near verbatim excerpts from a U.S. document classified at the SECRET level. A DIA original classification authority determination concluded that "DIA information in Document 1 would pose serious harm to U.S. national security as it could provide foreign adversaries significant insight into U.S. intelligence information and the sources/methods used to collect the intelligence." DIA also confirmed that "information is classified at the SECRET level if unauthorized disclosure could reasonably be expected to cause *serious damage* to the national security." (Emphasis in original).

Individual #2's recent admissions also corroborate the Defendant's electronic messages, which show that, on or about December 10, 2022, the Defendant transmitted a file with the same file name as Document 1 to a China-based co-conspirator.

Individual #2 also expressly confirmed to agents that the Defendant had sought "official information" from Individual #2 and that the information the Defendant sought mostly related to China, Taiwan, and related subjects. Individual #2 told investigators that the Defendant contacted him within the past two weeks with another opportunity. This is confirmed by a review of Individual #2's phone conducted pursuant to a federal search warrant, which showed that Individual #2 had the Defendant's phone number saved and that his most recent contact with the Defendant took place on October 10, 2025.

Based on the review of the Defendant's cellphone, agents believe the Defendant was developing yet another PRC contact based on the types of questions asked and the pattern

established with another person, who has yet to be identified. The importance of this discovery is that the Defendant does not appear to have stopped his work for the PRC. Rather, he was working as recently as mid-September to develop new contacts in the PRC. Finally, agents have watched the Defendant meet with subjects at restaurants in Washington D.C. as recently as mid-September. The seized phones provided the names of these individuals, who were not family or friends. Rather, at least one of these individuals is a former federal worker, while another is believed to have left federal service earlier in the year. This is additional evidence of the Defendant's ongoing efforts to recruit U.S. security clearance holders for the PRC Government.

### C.     History and Characteristics of the Person

Although the Defendant has no prior criminal history, that is not unusual in these types of cases. Foreign governments understand that a person with a criminal record would not be able to procure the type of information valuable to them. So, it is no surprise that the Defendant does not even have a parking violation. However, this alone does not justify release. We must look to the actions he took and is willing to take. The actions detailed in the Complaint and the Defendant's own description of himself as a "mercenary who only believes in money" ultimately, unfortunately, tell the Court what it needs to know about his history and characteristics.

Espionage is by its nature a surreptitious crime and, as detailed above, the Defendant has repeatedly demonstrated his efforts to evade detection by the United States Government. Given this history of evasion, there is good reason to conclude that the Defendant will take steps to evade any manner of conditions imposed by this Court, including by fleeing to avoid prosecution.

### D.     Risk of Flight

As supported by the allegations in the Complaint, the Defendant had a multi-year relationship with a foreign intelligence service that has the capability to assist him with efforts to flee or even to exfiltrate him from the United States using clandestine methods. This could be as simple as him going to the PRC embassy in Washington, D.C., or the consulate in Chicago, Illinois, and obtaining a Chinese-supplied passport or other assistance leaving the country. In an espionage case like this, having the Defendant surrender his U.S. passport has limited effect when he can simply knock on the door of Chinese government institutions located in this country.

These are not merely hypothetical risks. Two defendants awaiting extradition from Serbia to the United States on charges of, *inter alia*, trying to smuggle sensitive military technology to China recently fled from house arrest in Belgrade.[6] For the reasons detailed above, given their yearslong relationship with the Defendant, the PRC may be motivated to assist in extracting him from the United States. But irrespective of the PRC Government's willingness to help the Defendant flee, unlike many other defendants, the Defendant's coconspirators undisputably have the capability to facilitate the Defendant's flight from justice. Importantly, should the Defendant reach the PRC, he will not be subject to extradition. Under similar circumstances, other judges have found a risk of flight supported detention. *See United States v. Wenheng Zhao*, No. 2:23-CR-372-RGK, ECF No. 51, at *2 (C.D.C.A. Oct. 3. 2023) (finding a risk of flight where the defendant had searched for one-way flights and had $20,000 in cash in a grocery bag in his car). Here, based on the pretrial report, the Defendant has $60,000 in his bank account. These assets are sufficient standing alone for the Defendant to flee the United States, in addition to the help he might receive from the PRC Government or its agents.

---

[6] *See generally* https://www.rferl.org/a/serbia-john-miller-cui-guanghai-arms-smuggling-apec-xi/33531833.html. This article illustrates that home detention alone is not effective against highly motivated defendants facing serious national security charges.

14

### E. Danger to the Community

Finally, the nature and seriousness of the danger to the community support detention. As noted above, the Defendant's active efforts to obtain classified information relating to sensitive military topics over a period of years, and the fact that he received tens of thousands of dollars in payments from agents of the PRC strongly suggest that he obtained the types of sensitive information that could further compromise national security. Courts have repeatedly recognized the potential harm to the community that disclosure of national security information can pose. *See, e.g.*, *Zhao*, No. 2:23-CR-372-RGK, ECF No. 51, at *3 (finding that Defendant posed a risk to the community where "the Government alleges that Defendant held a Secret-level security clearance *and presumably knows more sensitive information…. As alleged, Defendant disclosed sensitive information and is capable of disclosing more if released*." (emphasis added)); *see also United States v. Teixeira*, No. 1:23-CR-10159-IT, ECF No. 37, at *18-19 (D. Mass. May 22, 2023) ("The risk of future disclosures is intolerable; it could jeopardize the safety of soldiers, citizens, and allies of the United States. Moreover, Defendant's knowledge of TS/SCI did not end with termination of his TS/SCI access. He transcribed, photographed, and discussed TS/SCI and, at a minimum, retains recall of such information.") (emphasis added) (citing *Madrigal*, 2023 WL 2823504, at *11, for the proposition that the threat of harm the defendant posed to the United States remained high even though defendant no longer had access to the relevant systems); *United States v. Mallory*, 268 F. Supp. 3d 854, 866 (E.D. Va. 2017) (noting that the information the defendant "obtained through his decades of government employment, his apparent desire to sell those secrets to a foreign government, and defendant's skills in tradecraft all show that he poses a grave risk of endangering not only one person, but the U.S. itself"). This is one of the determinative factors in the § 3142 analysis.

15

## **CONCLUSION**

As detailed above, powerful evidence summarized in the detailed Complaint will establish that the Defendant committed the charged offense. He lacks any meaningful ties to this District, and even his ties to this country are diminished by the nature of the crimes he has chosen to commit and the relationship he has chosen to pursue with agents of the PRC. He lacks any real employment distinct from the criminal activity at issue here and has a clear personal and financial incentive to avoid serving a potential life sentence (or even a Guidelines sentence, given that the Guidelines range here is 210 to 262 months pursuant to U.S.S.G. § 2M3.1). He has an established relationship with agents of the PRC and could exploit that relationship anytime simply by taking an Uber, a taxi, or a subway to the Chinese embassy or any Chinese consulate (including the one in Chicago, Illinois). The Defendant's own statements show him to be motivated by personal interest, personal gain, and personal profit – *i.e.*, that he is a mercenary.

For the foregoing reasons, the Defendant should be detained pending trial.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

_____/s/_____
Patricia McLane
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-209-4800
Patricia.McLane@usdoj.gov